## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

AVANI RESOURCES PTE, LTD.

      **Plaintiff,**

v.

      **CASE NO.:** 2:24-cv-00604

      ***JURY TRIAL DEMANDED***

**ADAM WILSON,**

and, **ROBIN FRYER**

      **Defendants.**

## COMPLAINT

Through a stream of fraudulent misrepresentations and material omissions, Defendant Adam Wilson, who had been entrusted with confidential information, significant investments, and substantial responsibility, exploited his insider knowledge and conspired to conceal material facts from Avani Resources Pte, Ltd. ("Avani"), an investor he helped to court, defrauding it out of millions of dollars for Wilson's coal mining operations in southern West Virginia. This deceptive scheme served Wilson's efforts to enrich himself and shield his mismanagement from Avani while he continued to funnel and squander tens of millions of dollars from Avani based on false pretenses and broken promises. Defendant Robin Fryer, exercising his outsized influence as chairman of the controlling board of directors, conspired with and aided and abetted Wilson's fraud. Avani brings this action to hold Wilson and Fryer accountable and recover the substantial financial resources Wilson deceptively procured from Avani with Fryer's willing assistance and support. Through this Complaint, Avani seeks compensatory and punitive damages, as well as other relief for the harm Wilson and Fryer caused.

## PARTIES

1. **Plaintiff – Avani Resources Pte, Ltd.:** Avani is a foreign private limited corporation registered in the Republic of Singapore, that invests in various coal-related businesses around the world, including in southern West Virginia. As part of this work, Avani became the largest shareholder in Ben's Creek Group PLC ("PLC"). PLC held multiple subsidiaries, Ben's Creek Operations WV, LLC ("BCO"), Ben's Creek Land, LLC ("BCL"), and Ben's Creek Carbon, LLC ("BCC"), (together, the "WV BC Entities," or jointly or separately with PLC as appropriate, "Ben's Creek"), all of which were involved in coal mining operations in southern West Virginia and managed by the Defendant Wilson. Avani also became a substantial lender to Ben's Creek.

2. **Defendant – Adam Wilson:** Adam Wilson is an individual and upon information and belief is a resident of Florida. Upon information and belief, he is involved in managing Freeland Anthracite in the Commonwealth of Pennsylvania. During the period relevant to this Complaint, Wilson was employed as CEO of Ben's Creek Group, PLC, a company registered in England and Wales, and the manager of the WV BC Entities, which are Delaware limited liability companies. While serving in these roles, Wilson primarily conducted business from his office or the apartment he maintained in Charleston, West Virginia, and throughout the Southern District of West Virginia.

3. **Defendant – Robin Fryer:** Robin Fryer is an individual and upon information and belief is a resident of Connecticut. Upon information and belief he is currently the Director and Audit Committee Chair for Georgina Energy and is a financial consultant. During the period relevant to this Complaint, Fryer was the non-executive Chairman of PLC. While

serving in this role, Fryer chaired the board of directors overseeing the WV BC Entities and the coal mining operations in the Southern District West Virginia.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2), as the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between a corporation registered in a foreign state (Republic of Singapore) and citizens of the state of Florida and Connecticut.

5. This Court has personal jurisdiction over Defendant Wilson because, at all times relevant to the Complaint, Wilson worked in the Southern District of West Virginia, and the alleged tortious conduct primarily occurred within the Southern District of West Virginia.

6. Similarly, this Court has personal jurisdiction over Defendant Fryer because, at all times relevant to the Complaint, Fryer chaired the board overseeing coal mining operations in the Southern District of West Virginia, and the alleged tortious conduct all related to and knowingly affected dealings and involving property and transactions in the Southern District of West Virginia.

7. Venue is proper in the Southern District of West Virginia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. At all times relevant to the Complaint, Wilson maintained his office and an apartment in Charleston, West Virginia, and the relevant businesses were located and operated in the Southern District of West Virginia.

## FACTUAL ALLEGATIONS

8. Avani is a company that engages in the business of, among other things, buying and selling coal. It invests in assets to enable its trading business.

9.  Knowledgeable of Avani's involvement, Wilson and others, on his behalf, and with his consent or at his direction, engaged with Avani about investing in Ben's Creek. Based on those efforts, Avani invested in, and ultimately became the largest shareholder of PLC, owning approximately 30% of that company. In total, this amounted to tens of millions of dollars of invested capital.

10. PLC, at that time, held 100% ownership in BCO and its related entities through an ownership structure. BCO operated a coal mining operation in Mingo County, West Virginia. BCC managed BCO. BCL owned and held certain property and mineral interests in the furtherance of the coal mining operations.

11. From on or around June 2021 until his forced departure from the companies in April 2024, Defendant Adam Wilson, served as Chief Executive Officer of PLC, as well as CEO and/or manager of the WV BC Entities. During that period, Defendant Fryer served as Independent Chairman of the Board for PLC.

12. In these roles, Wilson engaged directly with Avani, as part of an effort to induce Avani to invest in the Ben's Creek project through his agents and representatives, to inform Avani of operational updates, to engage in coal sales to Avani, and to engage in other business interactions.

13. As part of that engagement, Wilson learned of risk frameworks created by Avani, which were ultimately intentionally disregarded by Wilson in furtherance of his personal scheme.

14. Over a period of months, Wilson engaged in consistent misrepresentations of the financial condition of the WV BC Entities, as well as their operational capabilities in an effort to induce Avani to invest additional capital in his failing operation.

15. Wilson, through this period, concealed from Avani operational difficulties, environmental and regulatory concerns, the extent of financial distress of the WV BC Entities, and gave the false impression and assurance to Avani that BCO and its related entities were financially stable.

16. However, contrary to these representations to Avani, the situation was dire, and the investments Wilson secured from Avani were secured under false and fraudulent pretenses.

17. Wilson's misconduct, mismanagement, and repeated fraudulent conduct led to the severe financial destabilization of the WV BC Entities, culminating in Wilson's termination from his roles, and the filing of Chapter 11 bankruptcy proceedings by the entities shortly thereafter. Those bankruptcy proceedings remain ongoing.

18. Upon information and belief, Fryer enabled and supported the mismanagement, fraudulent conduct, and reckless behaviors that defrauded Avani, and caused significant harm and financial losses to it.

19. As a direct and proximate result of Wilson and Fryer's conduct, Avani sustained millions of dollars in losses, as well as significant lost opportunities and other hardships.

## A. Misrepresentations Surrounding the Second High Wall Miner

20. A key aspect of Wilson's scheme to defraud Avani involved misrepresentations surrounding the needless contracting of a *second* high wall miner for the Ben's Creek operations.

21. In the fall and winter of 2023, Wilson assured Avani repeatedly that obtaining a second high wall miner was necessary for expanding Ben's Creek's production capacity and profitability and that it would be useful.

22. Despite these representations, the second high wall miner was never intended or likely to provide any true material benefit to Ben's Creek's operations. Wilson knew, or should have known, through reasonable diligence, that Ben's Creek's operational difficulties would preclude the effective use of this equipment.

23. In contracting for the second high wall miner, Wilson agreed to a take-or-pay contract, meaning that Ben's Creek would be forced to pay even if the high wall miner was not able to be utilized.

24. Engaging the second miner under a take-or-pay contract placed a substantial and avoidable financial burden on the companies that Wilson knew or should have been aware of because the miner was never going to be utilized profitably.

25. At the time Wilson advocated for the contracting of the second high wall miner, Ben's Creek had already encountered severe problems with its refuse cell, which rendered significant parts of its operations, including the wash plant, significantly less efficient and operative.

26. Upon information and belief, Wilson concealed this information from Avani as long as possible. Wilson then continued to push for the acquisition of the second high wall miner and other unnecessary costs to further defraud Avani.

27. Upon information and belief, Wilson utilized the second high wall miner as a tool in his scheme to artificially inflate the stock price of Ben's Creek and attract further investments from Avani, despite actual or constructive knowledge that the equipment would not contribute to the financial stability or growth of Ben's Creek. In doing so, Wilson's plan would serve to enrich himself at the expense of Avani.

28. As part of this scheme, based on information and belief, Wilson created misleading videos and images of the high wall miner purportedly in operation, when in reality, he had simply instructed employees to place coal that had already been mined onto the machine in order to present a false image of productivity.

**B. Misrepresentations Surrounding Operations**

29. In addition to the second high wall miner, Wilson repeatedly misled Avani about the true status and prospects of Ben's Creek's operations.

30. Although many of Wilson's misrepresentations were to Avani representatives directly, some of his misrepresentations were made publicly to further the fraudulent scheme.

31. For example, on or about December 5, 2023, Wilson participated in a public interview with Stockbox, during which he repeatedly made false and misleading statements about Ben's Creek's operations, production capacity, and financial outlook.

32. Wilson painted a misleadingly positive picture of Ben's Creek's operations despite his full knowledge of ongoing operational problems, including environmental violations, the refuse cell failure, and operational issues with the wash plant. At a high level, the refuse cell issue concerned a lack of the necessary material to construct the requisite structures for storing coal refuse material. Likewise, that refuse cell issue created a backup problems and operational difficulties in the processing of coal through the wash plant.

33. Despite this knowledge, he continued to misrepresent the situation to Avani. Specifically, both before and contemporaneous to his December 5 interview, Wilson represented to Avani that these complex matters were rather simple and would likely be resolved within a week or two despite knowing, either actually or constructively, that this was not the case.

34. During the December 5, 2023 interview, upon information and belief, despite his knowledge to the contrary, Wilson indicated that the only production delay was due to purported delays in the trains coming to pick up the coal. However, he concealed the extent of the production issues hampering operations.

35. Specifically, while blaming train logistics for any production shortfalls, upon information and belief, Wilson fraudulently concealed from Avani the extent of the refuse cell and environmental issues that effectively halted operations and the ability to utilize the wash plant. Even when Avani finally learned of the issues, Wilson misled Avani regarding progress toward fixing the issues and the extent of how these environmental concerns might impact production.

36. Those misrepresentations were compounded by the high wall miner scheme detailed above, as the use of the second high wall miner would have only exacerbated the existing problems.

37. Avani did not ultimately become aware of the extent of the refuse cell and environmental issues, which effectively prevented profitable operations, until well after Wilson left Ben's Creek. Only then were the extent of problems, as well as the extent of Wilson's misrepresentations about them, discovered.

38. Wilson participated in other public interviews and declarations that misled Avani regarding the financial stability and trajectory of the company.

39. Additionally, despite the reality of the concealed dire circumstances, based on information and belief, Wilson and Fryer approved unreasonable bonus payments as detailed below. They did so while simultaneously assuring Avani that operational slowdowns were merely

temporary and under control. But they were actually or constructively aware that this was not the case.

40. At substantially the same time, Wilson continued to solicit significant cash investments from Avani, while concealing damaging information about Ben's Creek's status. His misrepresentations concealed the true risks associated with investing in, and lending to, Ben's Creek, leading Avani to make substantial capital contributions and loans based on false pretenses.

**C.  Unauthorized Contracts and Coal Sales**

41. To further this scheme and attempt to conceal his misconduct from Avani, from on or around September 2023 through early 2024, Wilson entered into unauthorized contracts for the sale of millions of dollars' worth of coal without the approval of his Board of Directors of which an executive of Avani was a member.  Specifically, by way of the governing documents, the Board had to approve all sales for all coal sale contracts of a certain volume while Avani had veto authority for all forward sale coal sale contracts beyond 30 days.

42. These unapproved sales were not known by Avani until it was too late to remedy the failures. The result exacerbated BCO's financial troubles and evidenced Wilson's disregard for his fiduciary obligations to Avani.

43. The unauthorized and undisclosed sales undermined Avani's ability to oversee Ben's Creek's operation and concealed from Avani the full extent of the financial and operational issues plaguing Ben's Creek.

44. The sales also compromised the ability of Avani to make informed decisions about coal purchases, investments, and other matters.

9

45. Based on information and belief, Wilson likely also engaged in the undisclosed sale of coal by truck to third parties without seeking necessary approval or appropriately disclosing his conduct.

46. As a direct and proximate result of these unauthorized contracts and the efforts by Wilson to conceal his dealings, Avani entered into additional sale and purchase, loan, and investment agreements, including but not limited to agreements in November of 2023 and February of 2024. These agreements were premised upon Wilson's fraudulent representations about Ben's Creek's ability to fulfill its contractual obligations to Avani without default on other obligations.

47. These misrepresentations and the proceeding problems caused by Wilson have led to significant litigation expense and hardship for Avani, which would not have occurred but for Defendants' misconduct.

**D.  Apparent Double Selling of Coal Assets**

48.  Upon information and belief, Wilson intentionally engaged in either the double selling of coal assets or selling more coal than he knew could be produced. As a result, he fraudulently sold the same coal on the same timetables to multiple buyers, including to Avani in a manner that led to competing claims for the coal that Ben's Creek could reasonably produce in a given time period. Wilson misrepresented Ben's Creek's ability to produce and deliver coal as promised under these sales agreements.

49. Upon information and belief, Wilson knowingly sold more coal than Ben's Creek could mine or prepare for delivery, intentionally inducing Avani to make payments for orders that Wilson knew, or should have known, that Ben's Creek could not fulfill.

50. As a direct and proximate result of Wilson's double-dealing and false promises, Avani has been forced into expensive litigation with other parties to protect and defend its rights under the sales agreements. Avani has been forced to expend significant time and resources in an effort to resolve the disputes caused by Wilson's fraudulent conduct.

**E. Mismanagement of BCO**

51. Upon information and belief, in order to further undermine visibility by Avani into the financial circumstances of Ben's Creek, Wilson directly concealed the lack of internal controls and avoided efforts to retain a Chief Financial Officer for over nine months in 2023. Such a CFO could have illuminated the matters Wilson had concealed.

52. Instead, Wilson empowered a purportedly independent director of the Board of Directors, Defendant Fryer, to serve in that capacity. Unbeknownst to Avani, Wilson Contracted with Fryer and agreed for Ben's Creek to pay him for the CFO services. Avani only became aware of this arrangement many months after it had occurred, during which time Ben's Creek fell further into financial disaster and Wilson continued to solicit further investment from Avani.

53. Upon information and belief, Fryer actively and persistently resisted efforts by Avani and the Board to expedite hiring a CFO, furthering the problems created by this undisclosed and problematic arrangement.

54. Worse still, Fryer served on the internal Audit Committee, which Avani was excluded from. Fryer was thus doubly and inherently conflicted, both as a purportedly independent chairman overseeing Ben's Creek and as the only member of the internal Audit Committee with accounting and auditing credentials.

55. Wilson, with the aid of Fryer, concealed this secret contract and relationship. In the December 5, 2023, interview noted above Wilson stated that the delay in picking a CFO was due to him wanting to find the right candidate. This was months after the concealed arrangement with Fryer had been agreed to and implemented. This misrepresentation was designed to hide from Avani the reality of the scheme in which Wilson was avoiding auditing of, and accountability for, his conduct.

56. Fryer's conflicts and failures led to the financial deterioration of Ben's Creek, and it directly and actively enabled Wilson's financial mismanagement of Ben's Creek and other misconduct that harmed Avani as described herein.

57. As illuminated by an independent audit by PKF Littlejohn LLP, which reviewed the financial year ending on March 31, 2023, Wilson with the aid of Fryer, created a free-wheeling and reckless system with lack of internal controls and checks and balances. That independent audit highlighted the flaws in Wilson and Fryer's covert scheme to avoid scrutiny for the financial management and clarified why such misrepresentations regarding the CFO search were part of this same scheme.

58. Despite the glaring issues illuminated to the Audit Committee and Fryer by the audit report, no measures were taken to properly account for the financial issues raised, and Fryer and Wilson continued the reckless mismanagement.

59. Based on information and belief, Fryer failed to act in an independent and honest manner in his role as member of the Audit Committee, and despite being aware of numerous red flags raised by the external auditors, continued to support and enable Wilson and his misconduct.

60. Additionally, while knowing and concealing the true extent of the dire financial circumstances, and while still soliciting and securing additional money from Avani, upon information and belief, Wilson conspired with Fryer to push an effort to pay Wilson, Fryer, and another director significant bonuses and other compensation.

61. Upon information and belief, Wilson and Fryer improperly utilized their outsized influence on the relevant board to force through the self-paid bonuses despite the dire financial circumstances they helped create, and unreasonable compensation packages for Wilson.

62. Upon information and belief, this was part of a pattern of Wilson and Fryer's conduct along with other investors to seek to benefit themselves economically while disregarding their fiduciary duties and obligations to Ben's Creek, Avani, and others.

63. This repeated tortious and unlawful conduct was further compounded by Wilson's repeated misrepresentations to Avani regarding the true financial circumstance, the ability of Ben's Creek to avoid default on all its obligations, and the actual potential prospects for the cash solicited from Avani. Fryer knew or should have known these facts but withheld such knowledge from Avani in an effort to aide Wilson in his efforts.

## F. Diversion of Efforts to Other Project

64. On top of the mismanagement detailed above, Wilson, while still purportedly serving as full-time CEO, without the knowledge or approval from Avani, upon information and belief, diverted resources and time to a separate coal mining project of his, Freeland Anthracite in Pennsylvania.

65. Upon information and belief, this secondary project diverted significant energy and resources from Ben's Creek, without Avani's knowledge and was largely concealed from Avani as Wilson continued to solicit more and more investment from it.

13

66. Wilson, upon information and belief, even attended conferences at the expense of Ben's Creek to discuss Freeland Anthracite and the anthracite coal market without disclosing such activity to Avani. Moreover, because Wilson, based on information and belief, refused to entertain adding additional customers for Ben's Creek, such travel could only plausibly have served his own personal ends.

67. Wilson, despite presenting himself to Avani as a full-time employee devoting all his time to Ben's Creek, upon information and belief, actively engaged in business on behalf of the alternative project, diverting critical resources—many of which Wilson had extracted from Avani—from BCO without disclosing it.

68. For example, on or about November 2023, at a conference in Pittsburgh, Pennsylvania, despite still owing duties as Chief Executive Officer of Ben's Creek, Wilson actively and openly solicited investors for his alternative mining project, Freeland Anthracite.

69. Based on information and belief, Wilson brought shareholders to the United States at Ben's Creek's expense and then attempted to induce investment in his alternative project without the knowledge or approval of Avani.

70. Further, upon information and belief, without disclosing it to Avani, Wilson permitted other senior Ben's Creek employees to divert energy and resources to unrelated projects despite the dire economic circumstances.

71. Despite these inherent conflicts, upon information and belief, Defendant Fryer approved of and allowed Wilson's conflicted behavior and shielded Wilson's efforts from scrutiny, protecting him from any negative consequences from the board.

72. For example, both employment contracts—contracts with PLC and the WV Ben's Creek Entities, that were not made public and that were facilitated and approved by Fryer—

14

permitted Wilson to work on matters for another company MBU UK Limited ("MBU"), which was a different major shareholder in PLC. This scheme created an inherent conflict and substantial risk of misappropriation of insider information.

73. Based on information and belief, this inherent conflict was operationalized to Avani's detriment, given MBU's joint interest in Wilson's second project, Freeland Anthracite.

74. Wilson, upon information and belief, despite owing duties to Avani, utilized this conflicted scheme to divert additional resources to his joint venture with MBU, to the detriment of Avani, and all of this was acquiesced to by Fryer.

75. In total, because of the Defendants' tortious and illegal conduct, Avani has been damaged and harmed to the tune of millions of dollars.

## CLAIMS FOR RELIEF

### Count I – Breach of Fiduciary Duty

76. Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

77. As Chief Executive Officer and/or Manager of the Ben's Creek entities, Defendant Wilson owed a fiduciary duty to act in the interest of and for the benefit of Avani as a significant shareholder and critical investor in his operations.

78. Similarly, as Chairman of the Board of Directors, Defendant Fryer owed a fiduciary duty to act in the interest of for the benefit of Avani as a significant shareholder and critical investor in his operations.

79. Defendant Wilson's repeated misrepresentations, material omissions, fraudulent business dealings and transactions, diversion of work, and apparent self-dealing, along with the

supportive efforts or acquiescence of Defendant Fryer, all breached those fiduciary duties to Avani.

80. Defendants misled Avani, misappropriated its investments and resources it committed to Ben's Creek, and fraudulently secured additional capital investment from Avani in breach of their duties.

81. Defendants misconduct departed from the fundamental standards of good faith and fair dealing that were inherent in their fiduciary relationship to Avani.

82. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Avani has suffered substantial financial harm, extensive litigation, and other harms to both reputation and operations.

## Count II – Fraudulent Misrepresentation

83. Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

84. Wilson intentionally and knowingly made false and misleading representations to Avani and fraudulently concealed critical information from Avani, omitted critical information from Avani, and continued said conduct for many months leading up to Defendant Wilson's termination from the companies.

85. The misrepresentations were made with the intent to deceive Avani regarding the true operational and financial situation of the companies, to conceal other misconduct or misappropriation of resources done for Wilson's own benefit, and to extract funds, investment, resources and information from Avani.

86. Avani reasonably relied on these misrepresentations of Wilson, as the Chief Executive and/or manager of the Ben's Creek entities, who was in person and visiting the mine and offices regularly.

87. Avani's reasonable reliance on Wilson's misrepresentation was to its detriment and said reliance directly and proximately resulted in the losses outlined above.

## Count III – Unjust Enrichment

88. Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

89. Defendants were aware of and received financial and other benefits due to their general conduct, breach of fiduciary duties, fraudulent misrepresentations, and other wrongful actions as articulated in this Complaint.

90. By diverting their efforts from Avani's interests and defrauding Avani, Defendants were unjustly enriched at the expense of Avani and its business operations.

91. Under the circumstances, it would be fundamentally inequitable for the Defendants to retain the unjustly obtained benefits without paying Avani the value of the benefits.

## Count IV – Civil Conspiracy

92. Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

93. Defendants, in concert with themselves and other entities and individuals, conspired to fraudulently misrepresent critical matters to Avani, and to extract money, resources, investment, and information from Avani, unjustly enriching themselves and others and tortiously interfering with Avani's business expectancies.

94. These actions constituted a shared plan between the Defendants and other actors to effectuate this scheme and encompassed either a spoken or unspoken agreement to engage in conduct to the detriment of Avani, as alleged in the Complaint. Each took actions in furtherance of the plan as outlined herein.

95. To the extent any of the conduct alleged herein was conducted partially by others not presently named in the Complaint, said actions were conducted with the agreement of and in furtherance of the improper goals of Defendants to tortiously harm Avani.

### Count V – Aiding and Abetting

96. Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

97. Wilson and Fryer breached their fiduciary duties as set forth herein.

98. Wilson and Fryer, respectively, knew of the other's breaches of fiduciary duty as set forth herein.

99. Wilson and Fryer nevertheless provided substantial assistance in the carrying out of each other's breaches of fiduciary duty.

100. Fryer knew or should have known of Wilson's conduct constituting fraud against Avani.

101. Fryer nevertheless provided substantial assistance to Wilson's ability to perpetrate fraud against Avani.

102. As a direct and proximate result of Defendants' aiding and abetting of each other's tortious conduct, Avani has suffered substantial financial harm, extensive litigation, and other harms to both reputation and operations.

### CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Avani respectfully requests the following relief:

- Trial by jury;

- Judgment against the Defendants in an amount of compensatory and consequential damages to be determined at trial, plus expenses and court costs;

- Attorney's fees and costs;

- Punitive damages against the Defendants under, *inter alia*, West Virginia Code § 55-7-29;

- Pre-judgment and post-judgment interest at the maximum allowable rates at law;

- Injunctive and equitable relief against the Defendants;

- Any such other and further relief as Avani may seek or be entitled to under law or equity.

Respectfully submitted,

**AVANI RESOURCES PTE LTD, by counsel**

*/s/ Michael B. Hissam*

Michael B. Hissam (WVSB #11526)
Max C. Gottlieb (WVSB #13201)
Carl W. Shaffer (WVSB #13260)
Daniel B. Schwaber (WVSB #14098)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
P: (681) 265-3802
F: (304) 982-8056
mhissam@hfdrlaw.com
mgottlieb@hfdrlaw.com
cshaffer@hfdrlaw.com
dschwaber@hfdrlaw.com